1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - X

MONIQUE DINGLE,                        :

              Plaintiff,        :

    vs.                                : Civil Action No:

DISTRICT OF COLUMBIA, et al., : 06-331(RCL)

          Defendants.     :

- - - - - - - - - - - - - - - X

MONIQUE DINGLE,                        :

              Plaintiff,        :

    vs.                                : Civil Action No:

MAURICE SCOTT, et al.,         : 06-950(RCL)

          Defendants.     :

- - - - - - - - - - - - - - - X

Washington, D.C.

Monday, June 4, 2007

Deposition of:  MONIQUE DINGLE, a witness herein,

called for examination by counsel for Defendants

in the above-entitled matter, pursuant to notice,

taken at the offices of Regan, Zambri & Long, 1919

**MONIQUE DINGLE**

Dingle v. Scott, et al                                                        6/4/2007

---

**22**

1    MR. CORNONI: You can answer, yeah.
2    THE WITNESS: Do I have to?
3    MR. CORNONI: Yeah.
4    THE WITNESS: Okay, I think it was
5    maybe 17.
6    BY MR. VRICOS:
7    Q. Okay, and what kind of alcohol?
8    MR. CORNONI: Just stop for a sec. Can
9    I have a proffer of how this is relevant?
10    MR. VRICOS: She was at a party the
11    night before. I'm going to inquire about whether
12    alcoholic beverages were --
13    MR. CORNONI: Well, certainly. I would
14    certainly let you ask that, but you're asking what
15    she did when she was 17 years old, unrelated to
16    the incident. I mean, to ask --
17    MR. VRICOS: It goes to her credibility
18    about whatever she's going to say about the party
19    that night.
20    MR. CORNONI: That she may have drank
21    alcoholic beverage years before?
22    MR. VRICOS: That she drinks.

---

**23**

1    MR. CORNONI: That's not been
2    established and that wouldn't go either.
3    I'll let you have a few follow-up
4    questions just to be careful here. But let's,
5    please, try to ask some questions about the
6    incidents in question rather than going into her
7    background as a child.
8    MR. VRICOS: I understand.
9    BY MR. VRICOS:
10    Q. When you had a drink what was it?
11    A. A beer.
12    Q. Okay.
13    Either now or at the time of the
14    incidents, do you take any medications?
15    A. Medications like --
16    Q. For whatever. For -- for a physical
17    condition, for -- a lot of people take medications
18    so that they can smooth out their personality and
19    their mood so they can feel better.
20    Do you take any kind of medication?
21    A. No.
22    Q. Not at all?

---

**24**

1    A. Uh-uh. No.
2    MR. CORNONI: You've got to say no.
3    That's okay, I do it too.
4    BY MR. VRICOS:
5    Q. At the time of the incidents you were
6    not taking any medication?
7    A. No.
8    Q. Okay, I want to ask you about May 8th,
9    2005, okay?
10    At some point that night were you at
11    the 600 block of Morton Street North West D.C.?
12    A. Yes.
13    Q. Where were you two hours previous to
14    that?
15    A. I don't remember.
16    Q. Okay, was there any kind of special
17    event going on that night, anything unusual?
18    A. There was a party.
19    Q. Okay, and what kind of party was it?
20    A. Just a get-together for one of my
21    friend's birthday.
22    Q. And where was that party?

---

**25**

1    A. It was at -- I don't remember which
2    building. I know which building but I don't know
3    what's the address.
4    Q. What street was it on?
5    A. It was on Morton Street.
6    Q. Was it near where the incident
7    occurred?
8    A. Yes, it was right in front of that
9    building.
10    Q. Okay, and what time -- do you recall
11    what time you got to that building?
12    A. What time?
13    Q. What time you arrived at the party.
14    A. I don't remember what time I arrived at
15    the party, but it -- it was before 10 o'clock.
16    Q. Okay, and who did you go with?
17    A. I went with Trina -- Katrina.
18    Q. Um-hum.
19    A. And Morgan.
20    Q. Okay, so you were at the party. Were
21    you at the party for more than two hours?
22    A. Yes.

---

7 (Pages 22 to 25)

**26**

1     Q.   Okay, the incident that occurred with
2  Officer Moore that we're going to talk about a
3  little bit, did that happen -- around what time
4  did that occur?
5     A.   It was around 1:40.
6     Q.   Okay, and were you at the party from
7  right before 10:00, like you say, all the way up
8  until that incident?
9     A.   Yes.
10    Q.   Okay.
11       Some of the girls that I asked about a
12 little while ago, Precious Godbee and Tori Green,
13 were they at the party as well?
14    A.   Yes.
15    Q.   Were they there approximately the same
16 time frame that you were there?
17    A.   I don't remember.
18    Q.   Okay, about how many people were at the
19 party?
20    A.   Maybe about -- more than 30.
21    Q.   More than 30?
22    A.   (Nodding head up and down, inaudible

**27**

1  response.)
2     Q.   Was this a large -- was it an apartment
3  that the party was being held in?
4     A.   Yes.
5     Q.   About how many rooms were in the
6  apartment?
7     A.   It's a two bedroom.
8     Q.   Okay, so there were about 30 people?
9     A.   Maybe more.
10    Q.   Maybe more than 30?
11    A.   Maybe.
12    Q.   Do you remember about what time the
13 party broke up?
14    A.   Around the time that I left.
15    Q.   Okay, and that would have been
16 approximately 1:40?
17    A.   Um-hum.  Yes.
18    Q.   Now, do you know why the party broke up
19 at that time?
20    A.   No.  Everybody was just ready to go.
21    Q.   Okay, all at once?
22    A.   No, some people left before us.  This

**28**

1  is one of my friend's house, so we stayed a little
2  bit longer.
3     Q.   Okay.
4     A.   Maybe 20 minutes longer.
5     Q.   I see.
6       So at the time that you left, do you
7  know if there had been any noise complaints at the
8  time?  Anybody say anything to that effect?
9     A.   Nobody came to the house and knocked on
10 the door.  But, to my knowledge, there was a noise
11 complaint.
12    Q.   Okay, and why do you say that?
13    A.   Because Officer Moore said.
14    Q.   Okay, and were there alcoholic
15 beverages served at the party?
16    A.   Yes.
17    Q.   Okay, and what kind of beverages were
18 those?
19       MR. CORNONI:  Objection to relevancy.
20       But you can answer.
21       THE WITNESS:  It was some type of blue
22 juice.  I don't know.

**29**

1       BY MR. VRICOS:
2     Q.   Like a punch?
3     A.   I don't know the names of the alcohol.
4     Q.   Okay, was the alcohol in bottles?
5     A.   Yes.
6     Q.   Was there -- was there beer served?
7     A.   No.
8     Q.   Was there wine served?
9     A.   No.
10    Q.   Okay, so it was only just these bottles
11 of blue beverage --
12    A.   Yes.
13    Q.   -- that you're talking about?
14    A.   Yes.
15    Q.   Had you had any?
16    A.   No.
17    Q.   None?
18    A.   No.
19    Q.   Had any of the -- had either Morgan or
20 Katrina had any alcoholic beverages that night?
21    A.   No.
22    Q.   Was this around the time of your

8  (Pages 26 to 29)

**MONIQUE DINGLE**

Dingle v. Scott, et al                                              6/4/2007

---

**34**

1    A.  -- and I dealt with a lot of officers
2   there.
3       Q.   DARE camp?
4    A.  Yes.
5       Q.   What's that?
6    A.  It's called Camp Brown, but it was
7   promoted by the Boys and Girls Club.
8       Q.   Okay.
9    A.  And they had a program during the
10  summer called DARE.
11      Q.   Okay, and do you know what DARE stands
12  for?
13   A.  No, I don't.
14      Q.   And do you know what kind of a program
15  it is?  Does it have a particular purpose?
16   A.  No, I'm not sure.  My sister was in the
17  camp and I just --
18      Q.   Okay
19   A.  -- I just went to camp with them,
20  so....
21      Q.   And police officers run the camp?
22   A.  Yes.  One of the main police officers

---

**35**

1   goes to my church.
2       Q.   Okay.
3           And prior to that -- prior to that, do
4   you recall anything longer than five years ago,
5   speaking with police, dealing with police,
6   anything like that?
7       MR. CORNONI:  Same objection.
8       You can answer.
9       THE WITNESS:  Yes, I deal with police
10  in my high school.
11      MR. VRICOS:  Okay
12      THE WITNESS:  Just we talk a lot,
13  friendship.
14      BY MR. VRICOS:
15      Q.   Okay, school resource officers; is that
16  what you're talking about or --
17   A.  Officers that come to our games to like
18  watch over the games.
19      Q.   What kind of games?
20   A.  Basketball games and football games.
21      Q.   Okay.  Okay.
22          So, you were at the party and you and

---

**36**

1   some friends left.  Were there any other people at
2   the time that you left the party leaving?
3    A.  Can you say that again?
4       Q.   Yeah, I'm sorry if I wasn't clear.
5           A little earlier you said that you and,
6   as you called them, the girls who were witnesses
7   left the party at around the same time.
8    A.  Um-hum.
9       Q.   Did you notice if there were any other
10  people leaving the party at that time?
11   A.  No.
12      Q.   Okay, when you came out of the party
13  where did you go?
14   A.  I went -- I walked in front of
15  Precious's car.
16      Q.   Okay, and where was her car?
17   A.  It was parked right on the side of the
18  building.
19      Q.   Okay, and is this a residential area?
20   A.  It's -- you mean by a lot of
21  apartments?
22      Q.   Do people live there or is it primarily

---

**37**

1   where businesses are or something like that?
2    A.  Yeah, it's residential.
3       Q.   Were you out -- where were you standing
4   at the time?
5    A.  In front of Precious's car.
6       Q.   About how many people were in that
7   area?
8    A.  It was all the witnesses.
9       Q.   And was there anybody else there?
10   A.  There were people walking around.
11      Q.   People who had been in the party?
12   A.  No, just guys that hang out around
13  there.
14      Q.   I see.  Men, primarily?
15   A.  Yes.
16      Q.   Okay, do you know any of these men?
17   A.  Yes, I do, but I don't remember exactly
18  who.
19      Q.   Okay, is -- and you just said you don't
20  remember their names and I understand that.
21   A.  Um-hum.
22      Q.   But do you remember how many of these

---

10  (Pages 34 to 37)

**MONIQUE DINGLE**

Dingle v. Scott, et al                                                          6/4/2007

---

42

1   you saw.
2       A.   They were pulling on the door.
3       Q.   They were pulling on the door on the
4   side of the building?
5       A.   Um-hum, yes.
6       Q.   Did you hear them say anything?
7       A.   No, I didn't.
8       Q.   Were they together the entire time?
9       A.   Yes.
10      Q.   Okay, and then what happened?
11      A.   Then they came over towards us and they
12  stated that there has been a complaint for a noise
13  and that they needed us to get off the block.
14      Q.   Okay, and did people begin to leave?
15      A.   Well, Katrina said yes. And as that
16  was going on I received a phone call and I
17  answered my phone. And I made eye contact with
18  Officer Moore.
19      Q.   When you say you made eye contact with
20  Officer Moore, how close were you?
21      A.   We were like arm's length.
22      Q.   And after he -- after he came and said

---

43

1   you need to get off the block -- first off, where
2   was the other officer at this time?
3       A.   I don't remember.
4       Q.   Okay, how close were you to Officer
5   Moore when he said you need to get off the block?
6       A.   I was arm's lengths.
7       Q.   Arm's length. And then your phone
8   rang?
9       A.   It rang when he was talking.
10      Q.   As he was saying you need to get off
11  the block it rang?
12      A.   It rang.
13      Q.   Okay.
14      A.   And then Katrina said yes, and that's
15  when I answered my phone. So she acknowledged the
16  fact that he was saying it and we were getting
17  ready to move --
18      Q.   Okay.
19      A.   -- I just happened to answer my phone
20  and made eye contact with him. And I guess he
21  thought I was being rude, but he pushed me.
22      Q.   He pushed you. Where did he push you?

---

44

1       A.   On my shoulders.
2       Q.   Okay, did he push you anywhere else? I
3   know that there was contact that came later, but
4   did he push you anywhere else during that time?
5       A.   No.
6       Q.   Okay, both shoulders or one shoulder?
7       A.   Both shoulders.
8       Q.   Now, what happened after that?
9       A.   After that he told me don't fuck with
10  him. He told me "get the fuck off the block."
11  And I told him he didn't have to put his hands on
12  me like that.
13      Q.   Okay.
14      A.   And then he took me by my left arm and
15  raised it behind my back and grabbed me by my neck
16  and slammed me on the car.
17      Q.   Okay.
18      A.   The police car.
19      Q.   Now, how -- did you say anything to him
20  at all during -- before you were put onto the
21  police car?
22      A.   I asked him -- yes, I told him that he

---

45

1   didn't have to put his hands on me.
2       Q.   Okay, and did he -- did -- did you try
3   to get away at all?
4       A.   No.
5       Q.   Did you -- if I say "resist" I'm not
6   using a legal term.
7            Did you try to pull away from him at
8   all?
9       A.   No.
10      Q.   You were cooperative with him?
11      A.   Yes.
12      Q.   Did you say anything about your
13  identification?
14      A.   Yes.
15      Q.   And when did you say that?
16      A.   I said that when he put me on the car.
17  I asked him was he going to ask me how old I was
18  because he said he was taking me to Juvenile.
19      Q.   How many times did you ask him that?
20      A.   A lot of times.
21      Q.   Okay, how many?
22      A.   It was more than ten times.

---

12  (Pages 42 to 45)

MONIQUE DINGLE

Dingle v. Scott, et al                                                    6/4/2007

---

46

1    Q.    Okay.
2          Did you notice the way any of the other
3    people were acting during this time period?
4    A.    Yes.
5    Q.    And how were they acting?
6    A.    My sister was crying.
7    Q.    And which sister?
8    A.    Morgan.
9    Q.    Morgan.
10         Were there any other -- did you notice
11   how any other people were behaving at this time?
12   A.    I only noticed Morgan and Katrina.
13   Q.    And did you notice whether any of the
14   other people were coming close to either of the
15   officers?
16   A.    No.
17   Q.    Okay, did you notice that other people
18   were coming close to the incident?
19   A.    No.
20   Q.    Did you notice more people getting
21   there?
22   A.    Yes.

---

47

1    Q.    Okay, and you saw them -- where did you
2    see them coming from?
3    A.    Over from the building.
4    Q.    Okay, and they were walking towards
5    where you were?
6    A.    This is -- no, this is like during all
7    this time, this is not at this one specific time.
8    Q.    Okay.
9    A.    Seemed like there was one time when I
10   was in the police car because I wasn't facing
11   behind me.
12   Q.    But during the point where the officer
13   is saying -- you say that he cursed at you and he
14   said move off the block --
15   A.    Um-hum.
16   Q.    -- were people beginning to take notice
17   of what was going on?
18   A.    No.
19   Q.    You -- did you notice or --
20   A.    I didn't.  I didn't notice.
21   Q.    Okay.
22         Did you, as a result of this, have any

---

48

1    bruises?
2    A.    No.
3    Q.    Did you have any injuries at all?
4    A.    No.  I just -- I felt that it in my
5    shoulder later on.
6    Q.    So you felt it in your shoulder.  You
7    know what, I'm talking about after this whole
8    incident.
9    A.    After.
10   Q.    Yeah.
11   A.    After the incident, yes, but it wasn't
12   like bruising or anything.
13   Q.    Okay.
14   A.    It was more like pain.
15   Q.    I see.
16         Did you ever go see a doctor about
17   that?
18   A.    No.
19   Q.    Did you tell anybody about that?
20   A.    About the pain?
21   Q.    Yeah.
22   A.    No, it was minor.

---

49

1    Q.    Okay, did you -- so you didn't tell
2    anyone about it at all either?
3    A.    About the pain?
4    Q.    Yeah.
5    A.    No.
6    Q.    Did you give any kind of -- I know that
7    there was -- there was a complaint made, that you
8    made a complaint with regard to this -- this
9    incident and that you gave a written statement
10   during that.
11         Have you given any other written
12   statements?
13   A.    Only the documents that you have.
14   Q.    Right.  And when I ask you stuff like
15   that I'm not asking for you to tell me anything
16   that you prepared or you said to your attorney,
17   I'm asking about for other people, okay?  Just so
18   you understand as a general rule.
19         So just that one statement that was
20   made with regard to the Office of Police
21   Complaints?
22   A.    It was two statements.  It was one

---

13  (Pages 46 to 49)

50

1  about Officer Moore and one about the downtown,
2  the District.
3      Q.  So there was a statement also made with
4  regard to what happened on the 23rd?
5      A.  Yes.
6      MR. CORNONI:  I think she's referring
7  to the two letters that you have.
8      THE WITNESS:  The two letters.
9      MR. CORNONI:  The may 17th and the -- I
10  forget what the other date of the letter is.
11      MR. VRICOS:  Okay.
12      BY MR. VRICOS:
13      Q.  At this time, when you were saying to
14  the officer why didn't -- tell me exactly what you
15  were saying about your ID.  Are you going to ask
16  about my ID; is that what you said?
17      A.  Yes.
18      Q.  Did you say anything else to him?
19      A.  I said -- later on I told him that I
20  was 18 and that he should look at my ID.
21      Q.  When he initially put his hands on you,
22  you say he touched your shoulders.  Did you say

51

1  anything to him then?
2      A.  No.
3      Q.  Nothing at all?
4      A.  No.  Only what I told you, that I asked
5  him -- that I said he shouldn't put his hands on
6  me.
7      Q.  Okay, and did you -- did you say -- was
8  there a lot of noise at the time?
9      A.  No.
10      Q.  Generally coming from other directions.
11      A.  No.
12      Q.  So, did you have to raise your voice at
13  all?
14      A.  No.
15      Q.  You just told him that?
16      A.  Yes.
17      Q.  And how about when you were saying are
18  you going to ask me for my ID?
19      A.  No, I didn't raise my voice or
20  anything; I was calm.
21      Q.  Um-hum.
22      Did Officer Moore ever tell you that he

52

1  had received complaints?
2      A.  No.
3      Q.  Did they ever say to you there's been a
4  noise complaint, you need to move along?
5      A.  Oh, yes.
6      Q.  Okay, so when did he say that?
7      A.  In the beginning when he first walked
8  up.
9      Q.  Okay, okay, so after -- who were you
10  speaking with on the phone when -- when you got
11  that call?
12      A.  Nefertiti.  She was at the party too.
13      Q.  Okay, okay, do you remember any of the
14  words that you said to her?
15      A.  Yes.  She was asking me where I was,
16  where was I.
17      Q.  And what did you tell her?
18      A.  I told her that I was outside.
19      Q.  Okay, do you remember anything else
20  that you said to her?
21      A.  That's about it; that's how far it got.
22      Q.  Did you ever say it is word "whatever"?

53

1      A.  To TeeTee?
2      Q.  Yes.
3      A.  Uh-uh.
4      MR. CORNONI:  You have to say "no".
5      THE WITNESS:  No.
6      MR. CORNONI:  You don't have to say
7  "no," you can say yes or no, but I could tell by
8  your response you wanted to say "no".
9      BY MR. VRICOS:
10      Q.  How long did the conversation with
11  Nefertiti take place?  How long did it last, I
12  should say.
13      A.  It wasn't long, maybe some seconds.
14      Q.  Do you remember how many times the
15  officers told you, told everybody to leave before
16  he came into contact with you?
17      A.  Yes.
18      Q.  How many times?
19      A.  One time.
20      Q.  Just one time?
21      A.  Yes.
22      Q.  And which officer?  That was Officer

**58**

1  Juvenile.
2      Q.   And why do you say that he thought you
3  were underage?
4      A.   Because he said he was going to take me
5  to Juvenile.
6      Q.   When did he say that?
7      A.   He said that when he took me to the
8  car. He said I told you to get the `F' off of the
9  block or the fuck off the block.
10     Q.   Okay.
11         All right, so after he loosened up a
12 little bit to let you get your ID out, what
13 happened?
14     A.   He let my arm go.
15     Q.   Okay.
16     A.   I got my ID, I gave it to him and told
17 him that I was 18 so could he let me go.
18     Q.   And then what happened?
19     A.   Then he looked at my ID and he was like
20 -- he was like I'm arresting you for resisting
21 arrest.
22     Q.   Okay, and then what happened?

**59**

1      A.   Then he put the handcuffs on me --
2      Q.   Okay.
3      A.   -- and put me on the car. And then he
4  took all my belongings out of my pocket, out of my
5  pockets and placed them on the car.
6      Q.   And what was in your pockets?
7      A.   I had a retainer, a dental retainer and
8  I had a Foot Locker card, 12 dollars, a bank card,
9  license and some change and a phone charger.
10     Q.   And all of those things were in your
11 pockets?
12     A.   No, and my jacket and pants pockets.
13     Q.   And you had a purse with you?
14     A.   No.
15     Q.   Did you take off your jacket?
16     A.   No.
17     Q.   He just searched you while you were
18 wearing all that?
19     A.   Yes.
20     Q.   Have you ever been to this area before,
21 the 600 block?
22     A.   Yes.

**60**

1      Q.   And when had you been there?
2          MR. CORNONI:  Just objection to
3  relevancy.
4          But you can answer.
5          THE WITNESS:  All the time, mostly
6  after school sometimes.
7          BY MR. VRICOS:
8      Q.   Do you have friends who live there?
9      A.   Yes.
10     Q.   Okay, are you aware of any kind of
11 criminal activity that's ever occurred there?
12         MR. CORNONI:  Same objection.
13         You can answer.
14         THE WITNESS:  Yes.
15         BY MR. VRICOS:
16     Q.   What kind of activity is that?
17     A.   Drugs.
18     Q.   And how is it that you form that
19 belief?
20     A.   Because there's sometimes drug cars out
21 there, police vans.
22     Q.   Police -- I'm sorry, I didn't hear you.

**61**

1      A.   You know, the police trucks, the drug
2  trucks?
3      Q.   Um-hum.
4      A.   I see them out there.
5      Q.   And are there people often who are out
6  in the street in that area?
7      A.   Yes.
8      Q.   Okay, and do you know of any drug
9  activity that's ever occurred there?
10     A.   No.
11     Q.   Okay, okay, after you said -- you told
12 him you were 18 and you asked him to let you go,
13 is there anything -- was there any physical
14 contact after that?
15     A.   Yes.
16     Q.   Oh, what was that?
17     A.   He had grabbed me by my hair and he
18 slammed me on the car again.
19     Q.   Okay, and how did he slam you on the
20 car?
21     A.   He grabbed me by my hair and pushed my
22 head down on the car.

16 (Pages 58 to 61)

MONIQUE DINGLE

Dingle v. Scott, et al                                                                                    6/4/2007

---

**62**

1    Q.    Your head?
2    A.    My hair, yeah.
3    Q.    What part did you -- what part of your
4    body came in contact with the car?
5    A.    My face.
6    Q.    Okay, what kind of hair style did you
7    have at the time?
8    A.    I had twisting.
9    Q.    What is that?
10   A.    Twist two strands -- twists, it's a
11   form of braids.
12   Q.    Okay, on the side of your head, in the
13   back of your head?
14   A.    It was just laid out, like all down
15   like that (indicating).
16   Q.    Did you have a pony tail at the time?
17   A.    No.
18   Q.    Okay, then after he pushed you, you say
19   he pushed your face to the car, what happened
20   after that?
21   A.    That's when he searched me.
22   Q.    Okay, and describe -- describe how he

---

**63**

1    searched you.  Did he reach into your pockets, did
2    he pat you down, did he use the front of his
3    hands, the back of his hands, tell me how he
4    searched you.
5    A.    He reached in my pockets and he made me
6    spread out a little bit on the car and he searched
7    my pockets.  He put his hands in my front pockets
8    and my back pockets and he put his hands in my
9    jacket.
10   Q.    Okay, in your pants pockets?
11   A.    Yes.
12   Q.    What kind of pants were you wearing?
13   A.    I was wearing boy jeans.
14   Q.    Boy jeans?
15   A.    Um-hum.
16   Q.    Is that a brand name or just some --
17   A.    No, the brand name, I had some Old Navy
18   jeans on.
19   Q.    So they were baggy jeans, is that what
20   you're --
21   A.    They weren't baggy, they were more like
22   -- I can't describe it, I think they were like

---

**64**

1    full cut.
2    Q.    Okay.
3    A.    Or the type of jeans -- I don't know
4    what you call them, but they are more of like a
5    fit jeans, fit men jeans.
6    Q.    Were they tighter fighting looser or
7    somewhere in between?
8    A.    They were tighter fitting.
9    Q.    Okay, so after -- after he searched you
10   and he put -- you're saying he put all of those
11   items on the hood of the car?
12   A.    Yes.
13   Q.    What happened then?
14   A.    He took me to the police car.
15   Q.    How did he take you to the police car?
16   A.    He was holding my arms.
17   Q.    Okay, did he put you in handcuffs?
18   A.    Yes.
19   Q.    How did he put the handcuffs on?
20   A.    I don't -- I don't remember which hand
21   he put it on first, but --
22   Q.    Were they behind your back?

---

**65**

1    A.    Yes, behind my back.
2    Q.    And at this time did you struggle with
3    him at all?
4    A.    No.
5    Q.    And how long were you -- where did he
6    put you?
7    A.    He put me in the back seat of his car.
8    Q.    And how long were you there?
9    A.    I don't remember how long.
10   Q.    Was it more than a minute?
11   A.    Yes.
12   Q.    More than five minutes?
13   A.    Yes.
14   Q.    Okay, immediately after he put you into
15   the -- did he tell you why he was putting you in
16   there?
17   A.    Well, he told me when he put the
18   handcuffs on me that he was arresting me for
19   resisting arrest.
20   Q.    After he put you in the -- in the
21   police car, is that the only time he talked to you
22   about why you were being arrested?

---

17  (Pages 62 to 65)

MONIQUE DINGLE

**Dingle v. Scott, et al**

6/4/2007

66

1    A.    Yes.
2    Q.    **What happened after he put you in the**
3    **police car?**
4    A.    He went to the front of the car and him
5    and another officer was talking.
6    Q.    **Okay, were you saying anything, were**
7    **you talking to anybody during this time?**
8    A.    No, not yet.
9    Q.    **Okay, and after he went and began to**
10   **talk with this other officer, did you hear what**
11   **they said?**
12   A.    No.
13   Q.    **Okay, after you noticed that they were**
14   **talking, what happened after that?**
15   A.    One of the other officers came up to
16   me, the Hispanic officer.
17   Q.    **Okay, what did he look like?**
18   A.    I just know he was Hispanic. I don't
19   remember him too much. We didn't really talk; we
20   didn't encounter a lot.
21   Q.    **Was he -- was he Caucasian-looking, was**
22   **he a black person, did he have light skin?**

67

1    A.    He was Hispanic. He was like
2    light-skinned Hispanic.
3    Q.    **Okay, and did he say anything to you?**
4    A.    Yes.
5    Q.    **What did he say?**
6    A.    I was -- I tried to explain to him that
7    Officer Moore was wrong for what he did to me.
8    And he said that I have an attitude problem and
9    Officer Moore didn't do anything wrong.
10   Q.    **Okay, and was -- how long did your**
11   **conversation with this officer last?**
12   A.    It was about two minutes, maybe.
13   Q.    **Did he say -- were there things said**
14   **than what you just described?**
15   A.    With me and that officer?
16   Q.    **Um-hum.**
17   A.    No. I had said something to him during
18   the incident because one of the times when I was
19   speaking to Officer Moore he said to me that if I
20   spit on him again then he was going to smack me.
21   Q.    **Okay.**
22   A.    And I looked at the Hispanic officer

68

1    and I said do you see this, and he looked away.
2    Q.    **And you never spit on Officer Moore?**
3    A.    No.
4    Q.    **Okay, and do you remember saying**
5    **anything else to that other officer?**
6    A.    No.
7    Q.    **Okay, what happened after that?**
8    A.    After I was in the car?
9    Q.    **Well, did you speak with anybody else**
10   **while you were in the car?**
11   A.    Yes, I spoke with Katrina.
12   Q.    **Okay, and what did you talk about with**
13   **her?**
14   A.    Well, Officer Moore had asked for my --
15   my information.
16   Q.    **Okay.**
17   A.    And I told him that everything he
18   needed was on my driver's license. And he said my
19   Social wasn't on there.
20   Q.    **Okay.**
21   A.    And I told him that I would like to
22   speak with my mother or an attorney before I give

69

1    you that information.
2    Q.    **Okay.**
3    A.    So then my sister -- he went back to
4    the front of the car and my sister talked to him.
5    And then she came over to me and she asked me to
6    give him my Social.
7    Q.    **Did you hear what she said to Officer**
8    **Moore? Did you hear what either one of them said?**
9    A.    I didn't hear what she said to him.
10   But she came to me and told me that she overheard
11   him talking about finding weed on me and she
12   wanted me to give him that information, so I did.
13   Q.    **Okay, what -- and did she say anything**
14   **else to you or --**
15   A.    Yeah, she said that she would pay the
16   fine.
17   Q.    **Okay, and what happened after that?**
18   A.    After that I gave him my information.
19   A black officer uncuffed me and said to me don't
20   try to do anything stupid.
21        And I told him that I didn't do
22   anything wrong, so I don't have to do anything

18    (Pages 66 to 69)

MONIQUE DINGLE

Dingle v. Scott, et al                                                    6/4/2007

---

74

1     A.   I went to the front of the car.
2     Q.   Okay.
3     A.   Well, that was after I got
4  unhandcuffed.
5     Q.   And right, that officer, the uniformed
6  officer took the handcuffs off you?
7     A.   Yes.
8     Q.   And he said don't do anything stupid?
9     A.   Yes.
10    Q.   Did he say anything else to you?
11    A.   No.
12    Q.   Okay, and what happened after that?
13    A.   I went to the front of the car and
14  Officer Moore completed a citation.
15    Q.   Okay, and did Officer Moore tell you
16  anything?
17    A.   He said that I can go downtown and go
18  to the District and pay the fine.
19    Q.   Okay, did he tell you anything else?
20    A.   Yes.  He told me -- he showed me where
21  his badge was and his name, what his name was.
22    Q.   On the citation itself?

---

75

1     A.   On the citation.
2     Q.   Did you ever keep a copy of that
3  citation?
4     A.   No.
5     Q.   What did you do with it?
6     A.   I went down and tried to request for a
7  trial.
8     Q.   I'll ask about that in just a second,
9  but what I'm asking is about the --
10         MR. CORNONI:  She's trying to tell you
11  when she went there they took it.
12         MR. VRICOS:  I see.
13         BY MR. VRICOS:
14    Q.   Okay, just tell me what happened to it.
15    A.   Well, they took it from me when I went
16  down to the District.
17    Q.   Okay.  Okay.
18         After Officer Moore issued the
19  citation, what happened after that?
20    A.   I grabbed my stuff off the car.
21    Q.   Okay, and was everything there?
22    A.   No.

---

76

1     Q.   Okay, and what was missing?
2     A.   My retainer.
3     Q.   And where had you been keeping the
4  retainer up to that point?
5     A.   In my pocket.
6     Q.   Which pocket?
7     A.   I don't know which pocket; it was in my
8  pants pocket.
9     Q.   And do you normally wear the retainer
10  -- like, I had braces and I only used to wear them
11  when I was sleeping.
12         When would you used to wear your
13  retainer?
14    A.   I just wore it whenever I felt like
15  wearing it.
16    Q.   Had you been wearing it that day?
17    A.   Yes.  I have to wear it a certain
18  amounts of hours during the day, so I just keep it
19  with me.
20    Q.   Okay, and did you ever recover that
21  retainer?
22    A.   No.

---

77

1     Q.   Did you ask Officer Moore about it?
2     A.   No, I didn't notice until I left.
3     Q.   When did you notice it missing?
4     A.   When I went got down the street to
5  the main street, to Georgia Avenue.
6     Q.   Okay, and you put all the other items
7  back in the pockets where you had them previously?
8     A.   Yes.  I went back to look for it.
9     Q.   You went -- and where did you look?
10    A.   On the ground.
11    Q.   Okay, when did you go back, that same
12  night?
13    A.   Yes.
14    Q.   Did you go back the next day or --
15    A.   No.
16    Q.   Was it -- what was the lighting like
17  where you were looking?
18    A.   It was dark.
19    Q.   It was dark.  There were no street
20  lights?
21    A.   I'm not sure.  I don't remember if
22  there were street lights right there.

---

20  (Pages 74 to 77)

**MONIQUE DINGLE**

Dingle v. Scott, et al                                      6/4/2007

78

1    Q.   Officer Moore, you said that he said
2  everybody should get off the block; right?
3    A.   Yes.
4    Q.   Did any of the other officers that you
5  were -- that you remember, either plain clothes
6  officers or uniformed officers, did any of them
7  ever say anything like that as well?
8    A.   No.
9    Q.   Okay, so how did you get home that
10  night?
11    A.   The bus.
12    Q.   And who did you ride with?
13    A.   Katrina, Morgan and Tori.
14    Q.   Okay, and did you go right home?
15    A.   Yes.
16    Q.   And about what time did you get home?
17    A.   I'm not sure.
18    Q.   Okay, about how long did this whole
19  incident -- after you left the party until you
20  left with your friends to finally go home, about
21  how long did that take?
22    A.   That whole incident happening?

79

1    Q.   The whole incident with Officer Moore
2  and after the party when you got on the bus.
3    A.   Maybe more than an hour.
4    Q.   Okay.
5      MR. VRICOS:  I'd like to try to finish
6  everything up before we break for lunch or
7  anything like that. I'd be happy to go straight
8  through.
9      MR. CORNONI:  Are you going to go to
10  the 23rd now?
11      Do you need a break?
12      THE WITNESS:  Yes.
13      MR. CORNONI:  We only need a
14  five-minute break.
15      (Whereupon, there was a short pause in
16  the proceedings.)
17      BY MR. VRICOS:
18    Q.   All right, so after you went home on
19  the bus with your sister and friends --
20    A.   Um-hum.
21    Q.   -- that night; is that correct?
22    A.   Yes.

80

1    Q.   Okay, how many days after that was it
2  that you went to the police station?
3    A.   I went there on the 23rd.
4    Q.   Okay, during those --
5    A.   That's to pay. But there was another
6  time that I went down to the station to figure out
7  how I can complete a police complaint.
8    Q.   Okay.
9      Did you -- other than filling out the
10  police complaint during that time frame did you --
11  did you -- did you speak with many people about
12  the incident?
13    A.   I spoke to some people.
14    Q.   And who did you speak with about it?
15    A.   I spoke with my father and my -- one of
16  my coaches.
17    Q.   Okay, and did you complete any kind of
18  written statement?
19    A.   About talking to them?
20    Q.   Any written statements other than the
21  ones we've already talked about here today.
22    A.   No.

81

1    Q.   Let's go ahead and talk about the 23rd.
2    A.   Okay.
3    Q.   Okay, what time of the day did you go
4  down there?
5    A.   It was at night.
6    Q.   Okay, and at around what time?
7    A.   I'm not sure.
8    Q.   Early in the evening, late in the
9  evening?
10    A.   It was dark.
11    Q.   It was dark.
12      And who did you go there with?
13    A.   My mother.
14    Q.   Just you and your mom?
15    A.   Yes.
16    Q.   And what happened when you got there?
17    A.   I had to sign in.
18    Q.   What did you bring with you, just the
19  one slip or the one citation or did you bring
20  anything else?
21    A.   The citation.
22    Q.   And when you got there tell me what

21  (Pages 78 to 81)

MONIQUE DINGLE

**Dingle v. Scott, et al**                                      6/4/2007

---

82

1   happened.
2       A.   Well, I spoke with Officer Scott.
3       Q.   Okay, and where was Officer Scott when
4   you walked in?
5       A.   I think he was at the front desk; I'm
6   not sure.
7       Q.   Okay, and was he polite?
8       A.   Yes.
9       Q.   And -- one second.
10           Okay, and after -- what did Officer
11  Scott say to you?
12      A.   I asked him could I request a trial.
13      Q.   Okay.
14      A.   And he took my citation and my ID and
15  he went to the back to talk with another officer.
16      Q.   Okay, and did you see the other officer
17  he was talking to?
18      A.   It was a female.
19      Q.   Okay, and what happened after that?
20      A.   He came back out and told me that I had
21  to pay the fine.
22      Q.   Okay, is that all he said to you?

---

83

1       A.   Yeah, or be arrested.
2       Q.   Okay, and was your mom there?
3       A.   Yes.
4       Q.   Was she talking to anybody?
5       A.   Yes.
6       Q.   Who was she talking to?
7       A.   She was talking to Officer Scott.
8       Q.   Was she doing -- was she sort of doing
9   the talking for both of you?
10      A.   Yes.
11      Q.   Okay, and what -- describe their
12  conversation.
13      A.   She wanted to know -- well, we were
14  trying to figure out why does it say that in order
15  to request a trial you don't have to pay the fine
16  and why he was saying that we had to pay the fine
17  in order to request a trial.
18      Q.   So that's what he was saying to you?
19      A.   Yes.
20      Q.   Okay, and then what happened?
21      A.   My mom called an attorney.
22      Q.   And do you know the name of the

---

84

1   attorney?
2       A.   No, I don't remember.
3       Q.   Did you ever see this attorney before?
4       A.   Yes, I have.
5       Q.   And when have you seen him?
6       A.   He ended up coming down to the station.
7       Q.   This attorney that came down to the
8   station, had you ever seen him before?
9       A.   No.
10      Q.   Okay, and do you know -- you don't know
11  his name?
12      A.   No.
13      Q.   Okay, so what happened -- what happened
14  after officer -- Officer Scott told you that you
15  had to either pay the fine -- you had to pay the
16  fine in order to have a trial?
17      A.   Well, my mom called the attorney and
18  tried to get him to speak with the attorney.
19      Q.   Okay.
20      A.   And he said that he wasn't going to
21  talk to him.
22      Q.   Okay.

---

85

1       A.   So then the attorney said that he was
2   going to come down to the station --
3       Q.   Okay.
4       A.   -- and talk to him.
5       Q.   Okay, and then what happened?
6       A.   And then me and my mom went and sat
7   down.
8       Q.   And how long did you sit down for?
9       A.   It wasn't long.  It was -- I'm not sure
10  how long, but it wasn't long.  It was maybe a few
11  minutes.
12      Q.   Okay.
13      A.   And a couple of officers came around
14  and huddled around me.  They were getting ready to
15  arrest me.
16      Q.   They were getting ready to arrest you?
17      A.   Yes.
18      Q.   While you were just sitting there?
19      A.   Yes.
20      Q.   And what officers were -- why do you
21  say they were getting ready to arrest you?
22      A.   Because they had the handcuffs and one

---

                              22  (Pages 82 to 85)

**MONIQUE DINGLE**

**Dingle v. Scott, et al**                                                      **6/4/2007**

---

86

1  of the -- one of the ladies said that I was
2  resisting arrest.
3     Q.  Do you remember which lady said that?
4     A.  No, I didn't know her name.
5     Q.  What did she look like?
6     A.  She was black.
7     Q.  And how old did she look?
8     A.  I'm not sure.
9     Q.  Was she --
10    A.  Older -- older than 25.
11    Q.  About how tall was she?
12    A.  Maybe over five two.
13    Q.  And was she slim, was she heavy,
14 somewhere in between?
15    A.  I think she was pregnant.
16    Q.  During this time when you and your mom
17 were sitting there, was your mom talking to
18 anybody?
19    A.  Yes.
20    Q.  Who was she talking to?
21    A.  She was talking to the officers that
22 were around us; I don't know specifically which

---

87

1  ones. But she was asking them why are they
2  arresting me.
3     Q.  Okay, and what did they -- did any of
4  the officers respond to you?
5     A.  No.
6     Q.  To her?
7     A.  (Shaking head back and forth, no
8  audible response.)
9     Q.  Were you arrested?
10    MR. CORNONI:  Objection.
11    But you can answer.
12    THE WITNESS:  Not physically.  They
13 didn't put the handcuffs on me.
14    BY MR. VRICOS:
15    Q.  Never put the handcuffs on you?
16    A.  No.
17    Q.  During the entire time there did you
18 ever have handcuffs put on you?
19    A.  No. I put my arms out, I stood up to
20 put my arms out so I can be arrested
21 (demonstrating). And my mom wouldn't let them
22 arrest me.

---

88

1     Q.  And why would you put your arms out
2  like that?
3     A.  Because they said that my mom needed to
4  hold my jewelry so they could arrest me.  So I
5  stood up to be arrested.
6     Q.  Did they use the word "arrest"?
7     A.  Yes.
8     Q.  And how many officers were around when
9  this happened?
10    A.  It was -- I know it was more than four.
11 I don't know how many, but it was a lot.
12    Q.  Okay, I want you to take a second and
13 think about it.  And I know this was a while ago,
14 but I want you to try to describe to me what these
15 officers looked like.
16       You said there were about four?
17    A.  There were more than four.  I don't --
18 I just remember the main ones.
19    Q.  Okay, tell me about them.
20    A.  Well, it was Officer Scott.
21    Q.  And did Officer Scott ever put
22 handcuffs on you?

---

89

1     A.  He was the one that was going to put
2  handcuffs on me.
3     Q.  Okay, okay, and describe Officer Scott
4  for me.
5     A.  He was slim, a little bit slim, like --
6  more like athletic and brown skin.
7     Q.  African American?
8     A.  Yes.
9     Q.  And so Officer Scott and who else?  You
10 said -- who were the other main ones?
11    A.  That came around me, that was the only
12 main one that was right there.
13    Q.  Okay.
14    A.  And then Officer Anderson came over.
15    Q.  Officer Anderson came over to you.
16    A.  Yeah.
17    Q.  And describe him, please.
18    A.  He was kind of old.
19    Q.  Okay, and what did he look like?
20    A.  He was African American.
21    Q.  Was he wearing a uniform?
22    A.  Yes.

---

23  (Pages 86 to 89)

MONIQUE DINGLE

Dingle v. Scott, et al                                                                    6/4/2007

---

**90**

1   Q.   A hat?
2   A.   I don't remember.
3   Q.   Okay, and he was African American.
4   A.   Yes.
5   Q.   Was he a fair-complected man or darker?
6   A.   I don't remember.
7   Q.   Okay, and when Officer Anderson came
8   over to you did he say anything?
9   A.   Yes.
10  Q.   Okay, what did he say?
11  A.   He said that he was just going to give
12  us a live scan and that we needed that in order to
13  request a trial.  And he stated that it wasn't
14  saying that I was being arrested, they just needed
15  it for their records.
16  Q.   And he used the words "live scan"?
17  A.   Yes.
18  Q.   And what happened next?
19  A.   My mom agreed and I went to the back
20  and he took my fingerprints.
21  Q.   Okay, how many fingers did you have
22  printed?

---

**91**

1   A.   I don't remember.
2   Q.   Did you put your fingers on an ink pad?
3   A.   I don't remember how many fingers I got
4   fingerprinted, but I did use an ink pad.
5   Q.   Is it possible that you only had one
6   finger print, like a thumb print or index finger
7   or something?
8   A.   It is possible.
9   Q.   Okay, and what else happened with
10  officer -- where did Officer Anderson take you,
11  how far did you have to walk?
12  A.   I had to walk to the back of the
13  station where it was -- where the jail cells were.
14  Q.   Were all the jail cells closed?
15  A.   No.
16  Q.   Okay, were there any -- did you see any
17  prisoners?
18  A.   No.
19  Q.   Where was Officer Anderson when you
20  were walking back there?
21  A.   He walked with me.
22  Q.   Did he escort you, did he touch you at

---

**92**

1   all?
2   A.   He escorted me, but he didn't touch me.
3   Q.   And did Officer Anderson do any other
4   kind of processing when he took you back there?
5   A.   Yes.
6   Q.   And what did he do?
7   A.   He made me sign some papers and he set
8   me up a court date.
9   Q.   Okay, and did you -- did you keep any
10  of those papers?
11  A.   I'm not sure.
12      THE WITNESS:  Do you have them here,
13  those papers?
14      MR. CORNONI:  We can't talk on the
15  record.
16      THE WITNESS:  Oh.
17      MR. VRICOS:  I'm going to ask you to
18  talk to Mr. Cornoni about that afterwards and see
19  if you have any of those papers and see if you can
20  remember what happened to them.
21      THE WITNESS:  Okay.
22      BY MR. VRICOS:

---

**93**

1   Q.   Now, after he took your information and
2   you had fingerprints done, what happened next?
3   A.   He took me -- he set up the court date.
4   Q.   How did he do that?
5   A.   He called somebody.
6   Q.   He called somebody?
7   A.   Yes.
8   Q.   Okay, and did you hear him talking to
9   that person?
10  A.   I heard him, but I wasn't paying
11  attention to him.  There was a basketball game on
12  and we had a conversation about that too.
13  Q.   I see.  And describe the conversation.
14  A.   Just talking about sports, what teams
15  we like.
16  Q.   Was he pleasant to deal with?
17  A.   Yeah.
18  Q.   And did he treat you respectfully?
19  A.   Yes.
20  Q.   Did any of the officers -- were any of
21  the officers disrespectful to you?
22  A.   Officer Scott was.

---

24  (Pages 90 to 93)

MONIQUE DINGLE

Dingle v. Scott, et al                                                          6/4/2007

---

94

1    Q.    Why --
2    A.    Not in the beginning.
3    Q.    I see.
4          Tell me how you think he was
5    disrespectful.
6    A.    Well, he wasn't listening to anything
7    that my mother was saying.
8    Q.    He was just not responding to you?
9    A.    He was just not responding.
10   Q.    Okay, and what were you saying?
11   A.    We were -- when we were asking him why,
12   why am I being arrested, or when we were asking
13   him about the ticket. Like, why does it say that
14   we can request a trial without paying and you
15   telling us something different.
16   Q.    Okay.
17   A.    And he wouldn't explain.
18   Q.    Okay.
19         Now, you said that there were some main
20   officers. You've talked about Officer Anderson
21   and Officer Scott and one female officer.
22   A.    Um-hum.

---

95

1    Q.    Were there any other officers that you
2    recall?
3    A.    Yes.
4    Q.    And describe those officers for me,
5    please.
6    A.    There was another white male.
7    Q.    Okay, what did he look like?
8    A.    He was older. I don't -- I don't
9    really know him that much. He was talking to my
10   mom and to the lawyers. I didn't talk to him.
11   Q.    Okay, and was this early after you got
12   there or later?
13   A.    This is later, after.
14   Q.    Okay.
15   A.    They were talking to him trying to get
16   him to explain why -- why have I have been
17   arrested.
18   Q.    Okay, and were you arrested?
19         MR. CORNONI: Objection.
20         But you can answer.
21         THE WITNESS: Papers, yes.
22         MR. VRICOS: Papers.

---

96

1          BY MR. VRICOS:
2    Q.    What do you mean "papers"?
3    A.    I had to do papers but not physically
4    -- not handcuffed.
5    Q.    Okay, and when you say "papers," please
6    describe to me what your understanding of this is.
7    A.    Well, my understanding is, is that I
8    have a police record.
9    Q.    Okay, and that arises out of --
10   A.    That day, the live scan.
11   Q.    The live scan.
12         During the time that you were there on
13   the 23rd, did any officers touch you?
14   A.    I don't remember.
15   Q.    Okay.
16         And there was -- you just described a
17   white officer --
18   A.    Yes.
19   Q.    -- that was a little older that was
20   talking to your mother and this attorney at some
21   point --
22   A.    Yes.

---

97

1    Q.    -- later.
2          Were there any other officers there?
3    A.    Yes, there was other officers there,
4    but I didn't pay them any attention.
5    Q.    Okay, earlier you said that there were
6    some main officers. Have you told me about all of
7    those or were there any remaining ones?
8    A.    Those are the main officers. But there
9    were officers that came and crowded me when I told
10   you that they were going to arrest me.
11   Q.    Okay.
12   A.    But I don't know those officers and
13   details, but I know that it was more males than
14   females.
15   Q.    Do you remember any -- other than
16   Officer Scott and Officer Anderson, do you
17   remember the names of any of the officers?
18   A.    There was an officer named Oliver.
19   Q.    Oliver. And male, female?
20   A.    That was a female.
21   Q.    Okay, and did you interact with her at
22   all?

---

25  (Pages 94 to 97)

MONIQUE DINGLE

Dingle v. Scott, et al                                              6/4/2007

---

98

1    A.   I did --
2    Q.   And what was --
3    A.   -- but not a lot.  She said -- she said
4  that I had to pay the fine or be arrested too.
5    Q.   She said that to you?
6    A.   Yes.
7    Q.   And was that your only interaction with
8  her?
9    A.   That I remember, yes.
10   Q.   Did you see your mother talking to her?
11   A.   I don't remember that.
12   Q.   I understand that the words that you
13 say that she used were not ones that you want to
14 hear, but are there -- was she professional when
15 she spoke to you, was she polite?
16   A.   No.
17   Q.   She was not polite.
18   A.   No.
19   Q.   How was she not polite?
20   A.   She was rude.  She said that I had to
21 pay it or I was going to be arrested.
22   Q.   Okay, and were there any other

---

99

1  officers?
2    A.   No.
3    Q.   Now, did you -- what happened after you
4  went back and you were having a discussion with
5  Officer Anderson?
6    A.   What happened afterwards?
7    Q.   Yeah.  He took your information; he
8  fingerprinted you; what happened next?
9    A.   He set up a court date and he told me,
10 then we went back out.  And then that's when my
11 mom was talking to the -- the attorney that came
12 and they were talking to the guy, Emerson [sic] I
13 think?
14   Q.   Okay, the white police officer?
15   A.   The white, the old, the old one.
16   Q.   Okay, and what happened then?
17   A.   They were just talking; I wasn't in a
18 conversation like that.
19   Q.   Okay, and how long did that period
20 continue on?
21   A.   That went on for a long time, like some
22 minutes.

---

100

1    Q.   Okay.
2    A.   More than 20.
3    Q.   And were they looking at -- were they
4  reviewing any documents or were they just talking;
5  do you recall?
6    A.   They were just talking.
7    Q.   Okay, and this attorney, was he doing
8  most of the talking or was your mom talking?
9    A.   They both were talking a lot.
10   Q.   And it was just to Officer Emerman?
11   A.   Yes.
12   Q.   Now, what happened after -- at some
13 point did they stop talking?
14   A.   Yes.
15   Q.   And what happened then?
16   A.   We left.
17   Q.   Okay, and you went home?
18   A.   Yes.
19   Q.   Did you show up for your court date?
20   A.   Yes.
21   Q.   Tell me what happened then.
22   A.   I showed up for the court date and

---

101

1  Officer Moore wasn't there.
2    Q.   That was down at the Superior
3  Courthouse?
4    A.   Yes.
5    Q.   Okay.
6    A.   And the judge said my name and then he
7  told me my case was dismissed.
8    Q.   Did he say anything else?
9    A.   No.
10   Q.   Do you remember the name of the judge?
11   A.   No.
12   Q.   What did the judge look like?
13   A.   I have no clue.
14   Q.   Male?
15   A.   Yes, he was a male.
16   Q.   Okay.
17   A.   He was a white male.
18   Q.   Okay.
19        And how long were you -- now, when you
20 were in court, the Court called your case --
21   A.   Yes.
22   Q.   -- called out your name?

---

26  (Pages 98 to 101)

MONIQUE DINGLE

**Dingle v. Scott, et al**                                                              **6/4/2007**

---

102

1    A.   Yes.
2    Q.   And what did you do?  Did you go up and
3  speak with the Court?
4    A.   I walked up and he said this is
5  dismissed and that was it.  I didn't talk or
6  anything.
7    Q.   Did he give you any explanation at all
8  on the record of why it was dismissed?
9    A.   No.
10    Q.   So he didn't explain to you that
11  Officer Moore wasn't here so, therefore, we
12  couldn't proceed or anything like that?
13    A.   No.
14    Q.   Were there any -- was it -- were you by
15  yourself or did you have an attorney?
16    A.   I was by myself.
17    Q.   Was there somebody from the government
18  there, was there a prosecutor there?
19    A.   There were -- yes.  I don't know them.
20    Q.   Okay.
21        And ever since the 8th have you ever
22  seen Officer Moore again?

---

104

1  time period did you go to the back of the station
2  house with Officer Anderson?  Total.
3    A.   Total?  More than ten minutes.
4    Q.   Was it less than 15 minutes?
5    A.   I'm not sure.
6    Q.   Was it more than 15 minutes?
7        MR. CORNONI:  It's okay if you're not
8  sure.
9        THE WITNESS:  I just know that it's
10  more than ten minutes, so I don't want to give you
11  an exact time.
12        MR. VRICOS:  Okay, sure.
13        BY MR. VRICOS:
14    Q.   Less than half an hour?
15    A.   Yes.
16    Q.   Do you think it was less than 20
17  minutes?
18    A.   No.
19    Q.   You're not sure?
20    A.   I'm not sure.
21    Q.   I don't mean to belabor the point.
22    A.   I'm not sure.

---

103

1    A.   Yes.
2    Q.   When did you see him?
3    A.   I seen him around -- he was over by the
4  nail salon by Morton Street.
5    Q.   And he was on duty at the time?
6    A.   Yes.
7    Q.   Okay, did you speak with him at all?
8    A.   No.
9    Q.   Did he speak with you?
10    A.   No.
11    Q.   Okay, have you seen any of these other
12  officers that we've talked about today?
13    A.   No.
14    Q.   Okay.
15        MR. VRICOS:  Give me just a second.
16        MR. CORNONI:  Yeah.
17        MR. VRICOS:  I'm coming down the home
18  stretch here.
19        (Whereupon, there was a short pause in
20  the proceedings.)
21        BY MR. VRICOS:
22    Q.   How long were you back -- how long a

---

105

1    Q.   So you don't recall at all if any
2  officers touched you during -- when you came to
3  the station house on the 23rd?
4    A.   No.
5    Q.   Okay.
6        MR. VRICOS:  Okay, I'd like to go ahead
7  and just mark this Defendant's Exhibit A.
8        (Defendants' Exhibit A,
9        marked for
10        identification.)
11        BY MR. VRICOS:
12    Q.   I'm going to hand you a copy -- oh,
13  wait a second, that's not right.
14        I'm going to give you a copy of your
15  complaint that was to the Office of the Citizen
16  Complaint Review.  That's how it's styled up on
17  top, dated May 17th, 2005.
18        Do you recognize this?
19    A.   Um-hum.
20    Q.   And how do you recognize it?
21    A.   Because I wrote it.
22    Q.   Okay, and have you had an opportunity

---

27  (Pages 102 to 105)

MONIQUE DINGLE

**Dingle v. Scott, et al**                                              **6/4/2007**

---

114

1    A.  Um-hum, that --
2         MR. CORNONI:  Wait, hold on, before I
3    object and let you answer he's got to finish his
4    question.
5         THE WITNESS:  Oh, sorry.
6         MR. CORNONI:  That's okay.
7         BY MR. VRICOS:
8    **Q.  And you also testified that Ms. Wheeler**
9    **was in a position to see everything that happened**
10   **between you and Officer Moore during that time;**
11   **correct?**
12   A.  Yes.
13   **Q.  Okay, so when you're saying that you**
14   **never raised your voice, that's not consistent**
15   **with what she said; correct?**
16        MR. CORNONI:  I'm going to object, same
17   objection.  Ms. Dingle has told you, she's
18   answered that question probably four times now.
19   She told you what happened that evening.
20        If you have questions about
21   Ms. Wheeler's statement you certainly can depose
22   Ms. Wheeler.

---

115

1         But she can answer that question about
2    whether or not she raised her voice one more time
3    and then I won't allow her to answer again.
4         THE WITNESS:  I think what somebody
5    else might think is a loud voice may not be a loud
6    voice.  So, I mean, we have two different
7    definitions of a loud voice.  I didn't raise my
8    voice; I don't recall myself raising my voice.
9         MR. VRICOS:  Okay, all right.
10        Just give me one second.
11        MR. CORNONI:  No, problem, please.
12        MR. VRICOS:  Okay, and I'd like to mark
13   Ms. Wheeler's statement that we just discussed on
14   the record and put it in as Defendants' B.
15             (Defendants' Exhibit B,
16             marked for
17             identification.)
18        BY MR. VRICOS:
19   **Q.  Do you believe that it was unreasonable**
20   **for Officer Moore or any of the other officers**
21   **there to -- for them to tell people to move along?**
22        MR. CORNONI:  Objection.

---

116

1         But you can answer.
2         THE WITNESS:  No, I think it was
3    reasonable.
4         BY MR. VRICOS:
5    **Q.  It was reasonable for them to say that?**
6    A.  Yes, it was.
7    **Q.  Do you recall, during the time when --**
8    **when you were interacting with Officer Moore and**
9    **after he put his hands on you, whether it was**
10   **prior to getting to the car or during or after, do**
11   **you remember anybody asking what's going on, what**
12   **did she do?  Do you recall hearing things like**
13   **that?**
14   A.  Yes, I've heard things like that, yes.
15   **Q.  Did you hear it many times or --**
16   A.  Yes.
17   **Q.  From approximately -- I'm asking you to**
18   **approximate here.**
19   A.  This was more on my left side, the
20   people closest to me.
21   **Q.  About how many people would you say**
22   **were saying that?**

---

117

1    A.  I don't know.
2    **Q.  More than two?**
3    A.  Yeah, more than two.
4    **Q.  More than four?**
5    A.  I'm not sure.
6    **Q.  Okay.**
7         **And how far away from you and Officer**
8    **Moore were the people who were asking that?**
9    A.  I'm not sure how far.
10   **Q.  Okay, can you give a rough estimate or**
11   **-- and I'll understand --**
12        MR. CORNONI:  I don't want you to
13   guess.
14        THE WITNESS:  I don't know -- I don't
15   know like how far that is.  It was about by the
16   fence.
17        MR. VRICOS:  Okay.
18        THE WITNESS:  Like the entrance of the
19   fence.
20        BY MR. VRICOS:
21   **Q.  Okay, was it -- was it further than the**
22   **wall over there (indicating) which is**

---

30  (Pages 114 to 117)