DEPOSITION OF OFFICER DAVID M. ANDERSON
CONDUCTED ON WEDNESDAY, JANUARY 17, 2007

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
- - - - - - - - - - - - - - - -+
                                |
MONIQUE DINGLE,                 |
                                |
          Plaintiff,            |  Civil Action Nos.
                                |  06-00950,
   vs.                          |  06-00331
                                |
DISTRICT OF COLUMBIA, et al,    |
                                |
          Defendants.           |
                                |
- - - - - - - - - - - - - - - -+
                                |
MONIQUE DINGLE,                 |
                                |
          Plaintiff,            |
                                |
   vs.                          |
                                |
MAURICE SCOTT, et al,           |
                                |
          Defendants.           |
                                |
--------------------------------x
```

Deposition of Officer David M. Anderson

Washington, D.C.

January 17th, 2007

10:00 a.m.

Job No. 1-94799

Pages 1 - 65

Reported by:  Laurie Bangart-Smith

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410  (800)292-4789  (301)762-8282  (703)288-0026  (410)539-3664

DEPOSITION OF OFFICER DAVID M. ANDERSON
CONDUCTED ON WEDNESDAY, JANUARY 17, 2007

Page 9

1    A    I don't really recall what time it was. It
2    was -- well, the 61D was brought to me at 21:30, I
3    think, 21:33 hours.
4    Q    I'm sorry. You say the 61D was brought to
5    you at what time?
6    A    About 21:31 hours.
7    Q    Which would be nine --
8    A    About 9:31.
9    Q    When you say "61D," what are you referring
10   to?
11   A    The citation form that officers issue to
12   defendants on the street. It's like a summons to
13   appear in the District within 15 days to either post
14   collateral or ask for a court date.
15   Q    And who presented you with the 61D at 9:30?
16   A    I'm not sure. It was one of the station
17   personnel, female station personnel.
18   Q    You don't recall her name?
19   A    No.
20   Q    We're talking -- just for clarification,
21   we're talking 9:30 at night?
22   A    Yes.

DEPOSITION OF OFFICER DAVID M. ANDERSON
CONDUCTED ON WEDNESDAY, JANUARY 17, 2007

Page 10

1   Q   After you were handed the 61D, what happened
2   next?
3   A   I processed it in our criminal justice
4   system, that's our CJIS, and obtained arrest numbers,
5   filled all the information out, and then I handed it
6   back to the station personnel.
7   Q   Okay. By "processing" the 61D, what do you
8   actually do?
9   A   I take all the information off the 163 and
10  enter it into the CJIS computer, which generates
11  numbers.
12  Q   When you say "163" --
13  A   I mean the 61D.
14  Q   So you take the information off the 61D, and
15  then you put it into the computer?
16  A   Yes.
17  Q   And then you said you obtained arrest
18  numbers?
19  A   Yes. It generates arrest numbers after you
20  put all the information in it. That's what you
21  consider booking. All 61Ds, 163s have to be processed
22  and booked.

DEPOSITION OF OFFICER DAVID M. ANDERSON
CONDUCTED ON WEDNESDAY, JANUARY 17, 2007

Page 13

```
 1   the computer, correct?
 2        A    Yes.
 3        Q    And then the computer spits out arrest
 4   numbers; is that correct?
 5        A    Yes.
 6        Q    Okay.  And at that point that's what you
 7   call the "booking" process?
 8        A    Yes.
 9        Q    Okay, and what is the booking process' main
10   function?
11        A    To generate numbers, to generate arrest
12   numbers for all arrests at that point.
13        Q    What did you do next after obtaining the
14   arrest numbers?
15        A    I hand-carried the 61D, the arrest numbers
16   which I printed on the form, and her I.D. back to the
17   station personnel.
18        Q    Did you hand any other documentation to the
19   station personnel?
20        A    No.
21        Q    Did you do anything else after that?
22        A    Yes.
```

Page 14

1    Q    What did you do?

2    A    The station personnel stated that Ms. Dingle

3  wanted -- requested a court date, so at that

4  particular time I got a citation form, added the 61D

5  into the options of our CJIS system, which would

6  generate a court date through our Pretrial Services.

7  I also called Pretrial Services in reference to this

8  and stated that Ms. Dingle wanted a court date in

9  reference to a 61D for disorderly conduct.

10   Q    Who did you call at Pretrial Services?

11   A    I just called Pretrial Services.  I can't

12 give you a name.

13   Q    You don't recall?

14   A    I don't recall any name.

15   Q    Okay, and then what happened next?  Were you

16 given a court date?

17   A    Yes.

18   Q    Were you given a court date by the Pretrial

19 Services?

20   A    Yes.

21   Q    Do you recall what that court date was?

22   A    Like 6/14/05.

DEPOSITION OF OFFICER DAVID M. ANDERSON
CONDUCTED ON WEDNESDAY, JANUARY 17, 2007

Page 15

1   Q   What did you do next?

2   A   I printed a court date on the citation form,
3   which included her information, her name, the arrest
4   numbers, the officer's name, with appear in court, and
5   I signed the document.  It's three boxes on the
6   citation form.  It's three boxes on the citation form.
7   The first box you appear, like it's traffic in D.C.
8   corporation counsel.  That's basically -- that's
9   basically your disorderly charges.  Your second one is
10  basically your criminal charges, and the third one I
11  think is District charges.

12  Q   So what type of charge, if you could explain
13  to me is a disorderly -- not even disorderly.  Let me
14  rephrase that.  What type of charge did Ms. Dingle
15  have relating to the earlier arrest in May?

16  A   Basically it's an incommoding charge.  It
17  falls underneath the disorderly statute.  I don't know
18  how to explain it any more.  It's just if you loud and
19  boisterous on the streets of Washington, D.C., you get
20  charged with disorderly conduct.

21  Q   Is it your understanding that it's not a
22  criminal charge?

DEPOSITION OF OFFICER DAVID M. ANDERSON
CONDUCTED ON WEDNESDAY, JANUARY 17, 2007

Page 16

 1    A    No.
 2         MR. VRICOS:  I'm going to object with regard
 3    as to what this witness observed and what his
 4    expertise is.
 5         You can answer the question if you know the
 6    answer.
 7         THE WITNESS:  All right.  No, it's not a
 8    criminal charge.  It's . . .
 9    BY MR. CORNONI:
10    Q    Okay.  I'm going to -- I was handed a packet
11    of four pages this morning by your counsel.  Could I
12    just have you identify what is in these four pages,
13    and then we'll mark it as Exhibit 1.
14    A    The first one is the Citation Release Form.
15    It's done for everyone who is eligible or gets
16    citation, which they have to -- we have to fill out
17    the front of it with the court date, and the station
18    clerk or the cell block tech will have to sign it with
19    badge and unit, and the arrestee signs it and dates
20    it.
21    Q    Before we go -- actually, I'll let you
22    discuss the second page, too.  Are the first two pages

DEPOSITION OF OFFICER DAVID M. ANDERSON
CONDUCTED ON WEDNESDAY, JANUARY 17, 2007

Page 17

1  together?
2      A    Yes.
3      Q    Can you describe the second page for me, and
4  then I'll ask you another question.
5      A    The second page is where the defendant's
6  thumbprint goes on for the court system.
7      Q    And the first two pages are considered one
8  form?
9      A    Yes, because this is the top and this is on
10 the back of it.
11     Q    Okay, so it's actually one sheet?
12     A    It's one sheet.
13     Q    All right.  And what are the other two
14 pages, Pages 3 and 4?
15     A    This is just 61D.  No.  Yeah, this is the
16 61D form which the officer fills out on the scene with
17 the information, the arrest location, CCN numbers.
18     Q    And the final page, Officer?
19     A    This is the back of the 61D where the
20 officer writes his notes or narrative, any stuff he
21 puts down.
22     Q    Okay.  I think it will probably be easier if

DEPOSITION OF OFFICER DAVID M. ANDERSON
CONDUCTED ON WEDNESDAY, JANUARY 17, 2007

Page 18

1  we mark the citation, those two sheets, as Exhibit 1,
2  and we'll mark the final two sheets, the 61D form, as
3  Exhibit 2.
4           MR. VRICOS:  That's fine.  Do you want me to
5  get a stapler?
6           MR. CORNONI:  Sure.
7           (Exhibits 1 and 2 were marked for
8  identification and attached to the deposition
9  transcript.)
10 BY MR. CORNONI:
11      Q    Now, before I ask you to describe the forms,
12 you stated that you fill out an officer's name on
13 Exhibit 1; is that correct?
14      A    Yes.
15      Q    Do you remember what officer's name you
16 would have filled out on Exhibit 1 on this case?
17      A    No, I don't.  I fill out so many, I don't --
18 no, I don't.
19      Q    Right, I understand that, so let me ask you
20 a different way.  How do you decide which officer's
21 name to put on that report?
22      A    It's stated on the 61D.

DEPOSITION OF OFFICER DAVID M. ANDERSON
CONDUCTED ON WEDNESDAY, JANUARY 17, 2007

Page 19

1    Q    So the officer filling out the 61D would be
2    the officer that you would identify on Exhibit 1?
3    A    Yes.
4    Q    After you filled out Exhibit 1, what did you
5    do next?
6    A    I hand-carried it out to the front, to
7    Ms. Dingle, and stated her court date was 6/14/05,
8    and, you know, you must go down on that date at like
9    8:30 in the morning, Courtroom 115, to face your above
10   charges, which are disorderly conduct. Failure to do
11   so, and they will issue a warrant for your arrest.
12        MR. VRICOS:  May I just make a point of
13   clarification. When you reference Ms. Dingle, are you
14   talking about the plaintiff in the case or whom other?
15        THE WITNESS:  The plaintiff.
16        MR. VRICOS:  Okay.
17   BY MR. CORNONI:
18   Q    And what happened after that?
19   A    Oh, after that, I asked the complainant
20   would she follow me in the back, because I need her to
21   sign and I need to put her thumbprint on the back of
22   the paperwork.

Page 23

1  of stuff. I mean I didn't really pay no attention to
2  her. I just tried to get Ms. Dingle, the complainant,
3  out of the -- take care of this, get her a number and
4  get her out of the station.
5      Q   Do you recall any exact statements that she
6  made to you that day, Ms. Dingle's mother?
7      A   Why was my daughter being arrested.
8      Q   Other than that?
9      A   That's it.
10     Q   What was your answer to that question?
11     A   Technically she's not being arrested. She
12 came up to the Third District to either pay the fine
13 or request a court date. That's what I'm doing now.
14 I'm giving her a court date so she can appear at a
15 later date in court.
16     Q   Did you place handcuffs on Ms. Dingle that
17 day?
18     A   No.
19     Q   Did anyone else?
20     A   No.
21     Q   At any time during this encounter on
22 May 23rd did you see any handcuffs ever placed on

Page 24

1  Ms. Dingle?

2      A    No.

3      Q    Did you fingerprint Ms. Dingle?

4      A    If you're referring to Livescanning, no.  I
5  only put one thumbprint, which was the right
6  thumbprint, on the back of the citation form.

7      Q    So she was fingerprinted but just her right
8  thumb?

9      A    Just her right thumb.

10     Q    What was the purpose of that?

11     A    For the court document.  Everybody who's
12 issued a 61D has to have the thumbprint on the back of
13 Exhibit 1.  If not, then we write "refused" on it.

14     Q    What happens if someone refuses?

15     A    Just they go to court.  Nothing happens.

16     Q    Does the person have the right to refuse to
17 give their thumbprint?

18     A    Yes.

19     Q    Did you advise Ms. Dingle of that right?

20     A    Yes.

21     Q    How did you advise her?

22     A    When I first encountered Ms. Dingle, the

DEPOSITION OF OFFICER DAVID M. ANDERSON
CONDUCTED ON WEDNESDAY, JANUARY 17, 2007

Page 25

1  complainant, out in front, I said, with your consent,
2  I need you to walk back with me so you can sign your
3  paperwork, and I'll put your thumbprint on you.  Your
4  mother can come if you want to.  It's not going to be
5  that long.  You're not under arrest.  I'm going to
6  walk you back to the back.  The reason why I walk you
7  to the back is because we don't have -- our
8  fingerprint pad in the station was missing.  Other
9  than that, she would have been thumbed outside the
10 station.
11      Q   Okay.  Did you ever explain to her that she
12 didn't need to give her thumbprint?
13      A   No.
14      Q   Why not?
15      A   Once she consented to it, I figured I didn't
16 need to.
17      Q   Prior to her giving her consent, did you
18 think it would be a good idea to let her know that she
19 didn't have to give her thumbprint?
20      A   No.
21      Q   You stated a term that I'm not familiar
22 with:  Livescanning.

DEPOSITION OF OFFICER DAVID M. ANDERSON
CONDUCTED ON WEDNESDAY, JANUARY 17, 2007

Page 26

1   A   Yes.

2   Q   Can you explain to me what that is.

3   A   Livescanning is when, if you're placed under
4   arrest for a charge of say disorderly conduct and you
5   wanted to make citation, what we do is we take
6   fingerprints of all ten of your fingers which is also
7   being photographed, we place it in our machine, and it
8   goes down to our Automated Fingerprint Section, and
9   they generate a PDID number, which is our police
10  identification number, which generates a six-digit
11  number.

12  Q   You stated a phrase: "Make citation." What
13  does that mean?

14  A   Yeah, if you get locked up for misdemeanors,
15  you are eligible to make citation if you're not on any
16  kind of supervision, parole or probation.

17  Q   And when you say "make citation," you mean
18  you're eligible to be given a citation and allowed to
19  leave the jail --

20  A   Yes.

21  Q   -- rather than staying and going to C-10?

22  A   Yes.

Page 27

1    Q    Now, Ms. Dingle's thumbprint, where does
2  that go after -- after going on this -- I understand
3  she makes her thumbprint on the form, but you referred
4  earlier to thumb prints going certain places.  Where
5  did Ms. Dingle's thumbprint go?
6    A    Right inside the box.
7    Q    Does it go into any systems?
8    A    No.
9    Q    Does it generate a PDID number?
10   A    No.
11   Q    Do you know if Ms. Dingle has a PDID number?
12   A    I never gave her one, and there wasn't one
13 never generated for her, from what I recall.
14   Q    It's your understanding that Ms. Dingle did
15 not receive a PDID number as a result of the earlier
16 May arrest?
17   A    Yes.
18   Q    And it's also your understanding that she
19 did not receive a PDID number as a result of the
20 May 23rd arrest?
21   A    Yes.
22   Q    Now, when you gave Ms. Dingle Exhibit 1, did

DEPOSITION OF OFFICER DAVID M. ANDERSON
CONDUCTED ON WEDNESDAY, JANUARY 17, 2007

Page 28

1  you give her Exhibit 2 as well?
2      A    No, I didn't give her Exhibit 2.
3      Q    Okay.  So what happened to the 61D that you
4  used to fill out the information on the Citation to
5  Appear in Court form?
6      A    I believe it was filed in our file cabinet.
7      Q    Okay, and where does it go after that?
8      A    A copy goes down to court with this form, we
9  keep a copy at the District, and I think that's it.
10     Q    Where does the copy go -- I understand it
11 goes to D.C. Superior Court, but is a jacket made for
12 this case?
13     A    I have no idea about that.  I don't know.
14     Q    Do you know who -- do you give it to a
15 certain person in the station, I mean the 61D to a
16 certain person in the station, and they bring it to
17 D.C. Superior Court?
18     A    I don't know about that.  I just hand it
19 back to the station clerk, and they file it.
20     Q    And do you also keep a copy of Exhibit 1 for
21 the police records in the police station?
22     A    Yes, we do.

DEPOSITION OF OFFICER DAVID M. ANDERSON
CONDUCTED ON WEDNESDAY, JANUARY 17, 2007

Page 29

1    Q    And do you submit a copy of Exhibit 1 to the
2    Court as well?
3    A    Yes.
4    Q    Now, did you advise Ms. Dingle to sign
5    Exhibit 1?
6    A    Yes.
7    Q    Did you advise Ms. Dingle that she needed to
8    go to court on June 14th?
9    A    Yes.
10   Q    Did the citation state a fine is not
11   required to be paid in order to request a trial, if
12   you recall?
13   A    I don't know -- I don't recall that being
14   stated.  I know our general orders states such.
15   Q    States that you're not required --
16   A    You're not required to post bond if you
17   requesting a court date.
18   Q    Did you advise Ms. Dingle that she must sign
19   this form, Exhibit 1?
20   A    I didn't advise her that she must sign it; I
21   just asked her to sign it.
22   Q    Do you know if Ms. Dingle went to court that

DEPOSITION OF OFFICER DAVID M. ANDERSON
CONDUCTED ON WEDNESDAY, JANUARY 17, 2007

Page 41

1  A  You can still request for -- you can still
2  request to have it expunged by going down to the court
3  system. They can do it.
4  Q  Is it a more difficult process after that?
5  A  I don't know.
6  Q  Okay. Now, does Ms. Dingle have -- on her
7  arrest record would it just be -- say she wasn't
8  arrested for any other offenses in her life. Would
9  she have two arrest records, one for the May 8th
10 encounter with Officer Moore --
11 A  No.
12 Q  -- and one for the May 23rd incident?
13 A  No.
14 Q  It would just be one arrest?
15 A  Just one arrest.
16 Q  And what would it say on it?
17 A  Disorderly conduct, which generated arrest
18 numbers, three arrest numbers, which states all her
19 information, her name, where she live at, her date of
20 birth and the disposition of the case. Not the
21 disposition of the case, but the citation court date
22 that was obtained.

DEPOSITION OF OFFICER DAVID M. ANDERSON
CONDUCTED ON WEDNESDAY, JANUARY 17, 2007

Page 46

1    Q    And during that conversation you talked with
2    Ms. Dingle's mother as well, correct?
3    A    Yes.
4    Q    And it was at that point you felt that
5    Ms. Dingle's mother was concerned about what was going
6    on?
7    A    Yes.
8    Q    And then what happened next?
9    A    Well, I explained to her her court date,
10   when to appear, and like for failure to appear, they
11   would issue a warrant for your arrest, and at this
12   particular time I'm requesting -- I'm requesting you
13   to come in the back to sign and date it, and also I'm
14   going to need a thumbprint on the back of the
15   paperwork for court purposes.  She said okay.
16   Q    And then how long did it take to do that?
17   A    To walk in the back?  No more than about
18   five, maybe about five to seven minutes.  Not even
19   that long.
20   Q    And then after she was printed, what
21   happened then?
22   A    Walked her to the front of the counter.

Page 47

```
 1      Q    Okay.
 2      A    Walked her back.
 3      Q    When you walked her back, were there other
 4   officers out there at that point?
 5      A    No.
 6      Q    Was it just Ms. Dingle?
 7      A    Just Ms. Dingle, her mother.
 8      Q    And what happened next?
 9      A    Nothing happened.  I advised the mother of
10   the court date and there's the form, and I left.
11      Q    Did Ms. Dingle's mother say anything to you
12   at that point?
13      A    No.
14      Q    Did you ever speak to a family attorney on
15   that day?
16      A    No.
17      Q    Is that everything that you were involved in
18   on May 23rd, 2005?
19      A    Yes.
20      Q    And approximately how long do you think that
21   whole process took, everything that you just described
22   to me?
```