Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

---------------------------------

MONIQUE DINGLE,

        Plaintiff,

  vs.                          Civil Action

DISTRICT OF COLUMBIA, et al.,   No. 06-00331 (RCL)

       Defendants.         Civil Action

-------------------------------x  No. 06-00950 -

                                       Consolidated

Deposition of SERGEANT STUART B. EMERMAN

Washington, D.C.

Wednesday, September 26, 2007

11:35 a.m.

Job No. 1-112892

Pages 1 - 64

Reported by Judith F. Richard, RPR

DEPOSITION OF SERGEANT STUART B. EMERMAN
CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2007

Page 18

```
 1   we are a total of approximately -- well, we just got
 2   rid of 80, so we're approximately, I think, 300, 340
 3   right now.
 4        Q.   Personnel.
 5        A.   Personnel, and that includes, I think,
 6   civilian as well.
 7        Q.   And at the station in 2005, if you
 8   remember, what were the different ranks of officers?
 9        A.   We have officers, we have master patrol
10   officers, sergeants, lieutenants, captains.  There
11   is a Third District inspector, but they are assigned
12   to the substation on Park Road.  And then we have
13   a commander of the Third District.
14        Q.   And where is the Third district station
15   located?
16        A.   1620 V Street, Northwest.
17        Q.   Now, you said -- going back to my earlier
18   question, you said that a supervisor was requested
19   to respond to the situation?
20        A.   That's correct, police station.
21        Q.   And do you know who requested that?
22        A.   I don't.  I don't know if it came over
```

DEPOSITION OF SERGEANT STUART B. EMERMAN
CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2007

Page 19

1  the phone, either on my cell phone or the office, or
2  if it came over the radio.  I just remember I was
3  the one who responded in.
4      Q.   And whether or not it came over cell
5  phone or the radio, do you remember what you were
6  told about the situation?
7      A.   I -- no.  There's -- usually told very
8  little, just respond to the station and see what it
9  is.
10     Q.   And you don't know how long it took for
11  you to respond to the call, do you?
12     A.   I generally, once I receive a call,
13  respond immediately.  So depends upon where I was.
14  Anywhere in the Third District, probably under 10
15  minutes would have gotten in there.  If I had been
16  in my office, even less.
17     Q.   And you don't know what time Ms. Dingle
18  and her mother got to the station, correct?
19     A.   Correct.
20     Q.   So you don't know how long a time it took
21  from when Ms. Dingle entered the station with her
22  mother and the time that you were actually in the

DEPOSITION OF SERGEANT STUART B. EMERMAN
CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2007

Page 20

1  station helping deal with the situation.
2      A.   Correct.
3      Q.   And so you got to the front part of the
4  station, correct?
5      A.   That's correct.
6      Q.   And we're calling that the lobby?
7      A.   The lobby is fine.
8      Q.   And what did you observe?
9      A.   I observed -- I know Officer Scott and
10 Officer Oliver were there, and there was Miss
11 Dingle, her mother, and another gentleman with them,
12 who I was informed was their attorney.
13     Q.   What did Ms. Dingle look like?
14     A.   I remember she was younger. I thought
15 probably teenage, late teens maybe. African
16 American female.
17     Q.   Was she tall or short?
18     A.   I don't recall.
19     Q.   Do you remember if she was slight build
20 or heavyset?
21     A.   As I recall, I think she was pretty
22 slight.

1    A.    No, I didn't.

2    Q.    Did you speak to Officer Scott about
3  this?  I mean -- I'm sorry -- yes, Officer Scott.

4    A.    Other than just right there, you know,
5  asking, you know, are you guys the ones here, this,
6  that.  That's all I -- you know.  No specifics about
7  who did what.

8    Q.    Now, is it your understanding that Ms.
9  Dingle was fingerprinted?

10   A.    Based upon what they stated to me, yes.

11   Q.    And did you ever learn any evidence that
12 would contradict that?

13   A.    No.

14   Q.    What did you say to them when they raised
15 those concerns?

16   A.    Well, I explained to them that -- I tried
17 to explain to them what my role in the department
18 was, that I was a patrol supervisor and that I did
19 not know the inner workings of the station, what
20 their procedures are in there.  I explained to them
21 that actually to request a hearing for a 61-D is
22 very rare, so I did not know whether the person had

DEPOSITION OF SERGEANT STUART B. EMERMAN
CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2007

Page 26

1  to be fingerprinted, thumbprinted, you know, retinal
2  scan.  I did not know the actual procedures for what
3  they had to do.
4             I did explain to them that -- they were
5  upset about the paperwork, like I said, where it
6  said that you have been arrested.  I explained to
7  them that it's department paperwork that we issue
8  out.  I explained to them that if they didn't like
9  the wording of it, that's something they could take
10 up with the chief's office or they could take up
11 with the -- I think it was corporation counsel's
12 office.
13      Q.    Was it your understanding that Ms. Dingle
14 was arrested that evening?
15      A.    Well, she's -- what happens is when you
16 receive a 61-D, it is a citation in lieu of an
17 arrest.  And in order to request a hearing or to pay
18 it, you are processed and you do receive an arrest
19 record.
20      Q.    Did Ms. Dingle receive an arrest record
21 prior to going to the station with her mother that
22 day?

DEPOSITION OF SERGEANT STUART B. EMERMAN
CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2007

Page 34

1    A.    That's my understanding.

2    Q.    And that's not protocol for 61-Ds,
3    correct?

4    A.    To what I'm aware of now, yes.

5    Q.    Now, what did you say to Ms. Dingle and
6    her mother and her attorney when they expressed
7    their concerns?  I believe I asked you this, but
8    we went onto a tangent.

9    A.    I explained to them that I wasn't
10   familiar with the exact processes and procedures
11   of what was going on in the back, you know, that
12   I explained to them that, you know, I don't know if
13   it's thumbprints, I don't know if it's fingerprints,
14   I don't know what the station crew is supposed to be
15   doing with that.  I did advise them how to file
16   a complaint against the officers, and I provided
17   them with complaint documents.

18         I also, like I say, explained to them
19   that if they had an issue with the wording of the
20   citation release paperwork, that they can bring that
21   to the office of the chief or down to the Attorney
22   General's office.  And I pretty much tried to answer

DEPOSITION OF SERGEANT STUART B. EMERMAN
CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2007

Page 35

1  as many questions -- I provided them with the name
2  and badge number of the officers, and they took my
3  name.  I think I gave them my card, actually.  And
4  I tried to answer as many questions as I was capable
5  of answering for them.
6       Q.    When you were talking to them, did they
7  appear upset?
8       A.    Yes, they did.
9       Q.    Who did?
10      A.    Both Miss Dingle and the gentleman who
11 said he was the attorney seemed a little -- he
12 seemed upset with the procedure and what had
13 happened.
14      Q.    And what do you mean by that?
15      A.    Well, initially they were all relaying
16 to me they were upset that the 61-D issue began, to
17 begin with.  And I told them I couldn't discuss the
18 merits of the case because I knew nothing about it.
19      Q.    And you have since learned nothing about
20 it.
21      A.    I have since learned nothing about it.
22 And I tried to explain that to them, that it