# Exhibit F

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - X

MONIQUE DINGLE,                    :

               Plaintiff,       :

   vs.                             : Civil Action No:

DISTRICT OF COLUMBIA, et al.,      : 06-331(RCL)

               Defendants.      :

- - - - - - - - - - - - - - - - - X

MONIQUE DINGLE,                    :

               Plaintiff,       :

   vs.                             : Civil Action No:

MAURICE SCOTT, et al.,             : 06-950(RCL)

               Defendants.      :

- - - - - - - - - - - - - - - - - X

              Washington, D.C.

             Monday, June 4, 2007

Deposition of: ANGELA DINGLE, a witness herein,

called for examination by counsel for Defendants

in the above-entitled matter, pursuant to notice,

taken at the offices of Regan, Zambri & Long, 1919

**Page 18**

1  period prior to the 23rd and after the 8th.
2      Did you review the citation?
3   A. Yes.
4   Q. Do you recall what happened to that,
5  physically what happened to that citation?
6   A. Officer Scott took the citation.
7   Q. Okay.
8      Did you review any other documents
9  prior to that date with your daughter?
10     Were there any that you were aware of,
11 I should say.
12  A. Yes, we reviewed the procedure for
13 filing a complaint.
14  Q. Okay.
15  A. We also reviewed the police complaints
16 Web site to get an understanding of what
17 procedures she needed to follow.
18  Q. Okay.
19     Now, at some point, because of the
20 nature of that citation, you went to the station
21 house with your daughter; correct?
22  A. Yes.

**Page 19**

1   Q. And that was on the 23rd of May?
2   A. Yes, it was.
3   Q. And what time of the day was that?
4   A. It was after 6:00 p.m.
5   Q. Was it light or dark out?
6   A. It was dusk.
7   Q. Now, once you got to the station house,
8  who did you speak with first?
9   A. Officer Scott.
10  Q. And where was he?
11  A. Behind the desk.
12  Q. And what did you say to him?
13  A. She talked to him.
14  Q. Monique talked to him?
15  A. Yeah.
16  Q. Okay, what did she say?
17  A. She asked if she could request a trial
18 date associated with the citation.
19  Q. Okay, and what did -- what, if
20 anything, did Officer Scott say?
21  A. Officer Scott said that she would have
22 to pay the fine in order to request a trial date.

**Page 20**

1   Q. Now, after he said that what was --
2  what, if anything, was your or your daughter's
3  reaction?
4   A. We flipped the ticket over and showed
5  him the writing on the back of the ticket that
6  said you don't have to pay the fine in order to
7  request a trial date.
8   Q. Okay, and what happened next?
9   A. He took the citation to another officer
10 that was sitting farther back in the station. And
11 she looked over the ticket and Monique's driver's
12 license, or learner's permit at that point, and he
13 came back and said she either has to pay the fine
14 or she has to be arrested.
15  Q. Do you remember what the officer that
16 he spoke with when he took the ticket back looked
17 like?
18  A. She was African American and she was
19 pregnant.
20  Q. Okay.
21     Now, after -- after Officer Scott came
22 back and said that, repeated that to you, what

**Page 21**

1  happened after that?
2   A. I said to him again that the procedure
3  on the back of the citation didn't say that she
4  had to pay the fine.
5   Q. Okay.
6   A. And I asked if we could have the
7  citation back and he said "no".
8   Q. Okay, and do you recall what happened
9  next?
10  A. She and I walked away from the desk,
11 and there was a bench over to the side. We sat
12 down on the bench and I called the attorney.
13  Q. Okay, and at some point did the
14 attorney arrive?
15  A. Yes, he did.
16  Q. Okay, and about how long did that take?
17  A. I don't recall. I'll say somewhere
18 between 20 and -- 20, maybe 30 minutes.
19  Q. During that time period after you went
20 and sat down and called the attorney and the time
21 he arrived, did you interact or speak with any
22 other officers?

Dingle v. District of Columbia, et al                                                                 6/4/2007

---

**Page 22**

1   A.   Yes.
2   Q.   Okay, and tell me, after you made your
3   phone call, what happened next.
4   A.   Officer Scott, Officer Oliver, who is a
5   female, Officer Anderson and two or three other
6   officers came from behind the desk. They
7   approached us while we were sitting.
8        The pregnant African American officer
9   said that Monique was resisting arrest and that
10  she needed to be handcuffed.
11       I don't recall which officer said it to
12  me, but one of them said you need to hold her
13  jewelry so that we can arrest her. And so then he
14  started taking off her jewelry. Neither one of us
15  got up from the seat; she took off her jewelry.
16       The officers were all standing in front
17  of us and then she stood up and put out her hands
18  (demonstrating) and he put the handcuffs on her.
19  At which point I said why she was being arrested.
20  Q.   Now, do you know why this officer said
21  to Monique that she was resisting arrest?
22  A.   I don't know, and that's the question

---

**Page 23**

1   that I asked, how can you say that we're resisting
2   arrest? Because the officer didn't say just
3   "she," she was saying that "we" were resisting
4   arrest. And I said I don't understand how that's
5   the case when we're just sitting here.
6   Q.   When you were up -- previously when you
7   were up at the counter talking to Officer Scott,
8   did he give you any instruction about how to
9   proceed?
10  A.   No.
11  Q.   When you left that counter area, did he
12  ask you to come back to the counter area?
13  A.   No.
14  Q.   Did you refuse to speak to him or
15  anyone else at the point?
16  A.   No, he refused to speak to the
17  attorney; we didn't refuse to speak to him
18  Q.   But that was later when the attorney
19  ultimately showed up.
20  A.   No. While I was on the phone with the
21  attorney I explained to him what was going on,
22  that they were saying that she had to either pay

---

**Page 24**

1   the fine or be arrested. And the attorney said
2   can I speak to him.
3        And I would point to him and the phone
4   and he said that he couldn't talk to him, he
5   couldn't talk to the attorney over the phone.
6   Q.   Okay, okay.
7        And then after that is when this female
8   officer came in?
9   A.   Several officers approached us.
10  Q.   Okay, but that was after -- so the
11  sequence of events is that you were up at the
12  counter with Officer Emerman, you went to go sit
13  down --
14       MR. CORNONI:  Officer Scott.
15       MR. VRICOS:  Sorry, Officer Scott.
16       BY MR. VRICOS:
17  Q.   And then you called the attorney?
18  A.   The attorney, correct.
19  Q.   And you asked that Officer Scott speak
20  with the attorney --
21  A.   Correct.
22  Q.   -- and he refused.

---

**Page 25**

1   A.   Correct.
2   Q.   And then what happened?
3   A.   Like I said, the officers were all
4   around and standing in front of us. And they
5   asked -- one of the officers asked me to -- okay,
6   another officer asked me to hold her jewelry so
7   that she could be arrested. And then Monique
8   stood up and put out her hands (demonstrating).
9        And the whole time I was asking why she
10  was being arrested.
11  Q.   At any time during this -- up until
12  this point did Monique raise her voice at all?
13  A.   No.
14  Q.   At any time did you raise your voice at
15  all?
16  A.   No.
17  Q.   And was Monique ultimately put in
18  handcuffs?
19  A.   She was not put in handcuffs in front
20  of me. I kept -- my whole point was why was she
21  being arrested; no one would tell me why she was
22  being arrested.

---

Page 26

```
 1         And she kept saying Mom, it's okay,
 2   I'll just do whatever they want me to do.
 3      Q.   Okay, so you never saw her cuffed.
 4      A.   I never saw her cuffed.
 5      Q.   Okay, do you have any reason to believe
 6   that she was ever cuffed?
 7      A.   No.
 8      Q.   Okay.
 9      A.   Not -- not that particular day.
10      Q.   Okay.
11           Now, did any of the officers -- the
12   officers who were speaking with you specifically
13   used the word "arrest"?
14      A.   Yes.
15      Q.   The term she has to be arrested?
16      A.   Yeah, Scott said specifically she had
17   to be arrested. The black female officer said she
18   had to be arrested, either pay the fine or she had
19   to be arrested.
20      Q.   Okay.
21      A.   Which is why I called the attorney.
22      Q.   Okay.
```

Page 27

```
 1           At some point did you speak with
 2   Officer Anderson?
 3      A.   Yes, I did.
 4      Q.   Okay, and what was your interaction
 5   with him?
 6      A.   Officer Anderson, at the point where
 7   Monique put her hands out for them to put the
 8   cuffs on her, I just continued to ask why she was
 9   going to be arrested. And I asked if they were
10   going to arrest her to wait until the attorney
11   could be present for them, you know, to make an
12   arrest.
13           So the officers were -- I felt like
14   they were trying to intimidate us. So Officer
15   Anderson was playing good guy. Oh, don't worry
16   about it, I'm not really going to arrest her.
17   That's not what's going on, I'm just going to live
18   scan her.
19      Q.   Okay, and did he explain what live scan
20   is?
21      A.   That's what I kept asking, what's live
22   scan? That's just what we have to do in order for
```

Page 28

```
 1   you to request your trial date.
 2      Q.   Okay, so Officer Anderson said that she
 3   wasn't being arrested.
 4      A.   Officer Anderson said she was not being
 5   arrested.
 6      Q.   And did he say anything else to you at
 7   that point?
 8      A.   I asked him to explain what live
 9   scanning was. And he said that's the procedure
10   that they have to follow in order for her to
11   request a trial date.
12      Q.   Okay.
13      A.   He just had to take her fingerprints
14   and then he'll request the trial date for her.
15      Q.   Okay, so he said that -- he said that
16   she'd have to be fingerprinted?
17      A.   He said he would have to take her
18   fingerprints in order to request a trial date.
19      Q.   And, in fact, do you know if that is
20   what happened?
21      A.   She told me that he took her
22   fingerprints and that he asked her to sign a piece
```

Page 29

```
 1   of paper, which I later saw, which said she had
 2   been arrested and charged with a crime.
 3      Q.   Okay, okay.
 4           Now, did officer -- did you observe any
 5   officers at any point put their hands on Monique?
 6      A.   Officer Anderson.
 7      Q.   And describe that, please.
 8      A.   Well, he's the one that took her back.
 9      Q.   How did he -- how did he touch her?
10      A.   I don't recall.
11      Q.   Okay, and she -- at this point she went
12   back with Officer Anderson?
13      A.   Yes.
14      Q.   After he had come down and kind of
15   explained, you said played good guy, but after he
16   had spoken with you that's when he took her back?
17      A.   Correct.
18      Q.   How long was -- did you see where he
19   took her?
20      A.   He took her down behind closed doors in
21   the station.
22      Q.   Okay, and how long was she gone for?
```

Case 1:06-cv-00950-RCL    Document 40-7    Filed 12/05/2007    Page 6 of 6
ANGELA DINGLE
Dingle v. District of Columbia, et al                                    6/4/2007

**34**

1  Q. Okay.
2     Now, was Monique ultimately given a
3  court date?
4  A. Yes.
5  Q. And was she allowed to leave that day?
6  A. Eventually, yes.
7  Q. Okay, was she ever detained?
8     MR. CORNONI: Objection.
9     But you can answer. Calls for a legal
10 conclusion, but you can answer.
11    THE WITNESS: Not while she was with
12 the officers.
13    BY MR. VRICOS:
14 Q. Did any officer ever say don't leave?
15 A. I don't know what Officer Anderson
16 would have said to her behind closed doors.
17 Q. Okay.
18 A. But no, they did not say don't leave
19 while we were sitting on the bench.
20 Q. Did you ever hear --
21 A. We could not leave while the officers
22 were standing there because we couldn't get out;

**35**

1  they blocked us in.
2  Q. How do you mean blocked you?
3  A. They stood physically in front of us.
4  There were at least six officers standing in front
5  of us.
6  Q. But those officers were discussing with
7  you --
8  A. No, they weren't. They were telling us
9  that she needed to be arrested because she was
10 resisting arrest.
11 Q. And that was the one officer who you
12 say was -- I believe you said, I don't know if it
13 was you or Monique -- she was pregnant?
14 A. There were several officers standing in
15 front of us. When we walked into the station
16 there were three officers behind the desk.
17    When we were sitting on the bench and
18 they said she had to be arrested, several of the
19 officers from behind the bench and from other
20 places in the station had come to converge in
21 front of us. We could not leave; we could not get
22 up without -- I would not have felt comfortable

**36**

1  attempting to walk out of there.
2  Q. Okay.
3  A. And we didn't.
4  Q. None of the officers ever told you
5  don't leave though?
6  A. No.
7     MR. CORNONI: Objection, asked and
8  answered.
9     But you can answer again.
10    THE WITNESS: The officer didn't tell
11 me don't leave.
12    MR. VRICOS:
13 Q. None of them.
14 A. No.
15 Q. After Officer -- I guess Sergeant
16 Emerman came and talked to you, what happened
17 after that?
18 A. Eventually Monique came out and we
19 left.
20 Q. Okay.
21    Sgt. Emerman's attempts to explain to
22 you the difference between live scanning and

**37**

1  fingerprinting, was that all that he said to you?
2  A. Yes, that's the gist of the
3  conversation; we didn't talk about anything else.
4  Q. You don't recall talking about anything
5  else with him?
6  A. I don't recall talking to him about
7  anything besides what was going on that day.
8  Q. Okay, I'm just trying to find out
9  exactly what was said.
10    You said that he was talking to you
11 about live scanning and finger printing. Did he
12 say anything else to you?
13 A. The conversation that I had with
14 Officer Emerman and with the attorney had to do
15 with -- I was asking for an explanation of whether
16 or not she had actually been arrested. Because I
17 don't know police procedures. And I didn't know
18 what was really going on, why one officer would
19 say arrest and the other one would say live scan
20 and the other one would say fingerprinting.
21    Those were the questions that I was
22 asking.